The PEOPLE of the State of
Colorado, Petitioner,

v.

Michael RODGERS, Respondent.

No. 86SC434.

Supreme Court of Colorado,
En Banc.

May 23, 1988.

Rehearing Denied June 13, 1988.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for petitioner.

David F. Vela, State Public Defender, Linda Perkins, Kathleen Lord, Deputy State Public Defenders, Denver, for respondent.

VOLLACK, Justice.

The People appeal from the court of appeals' reversal of the defendant's convictions in *People v. Rodgers*, 734 P.2d 145 (Colo.App.1986). We reverse the court of appeals' ruling and remand for reinstatement of the defendant's convictions.

I.

The testimony at trial established the following sequence of events. On the evening of November 7, 1983, Kelly Pryor met the defendant-respondent, Michael Rodgers (Rodgers or the defendant). Pryor was working as a waitress in a restaurant in a

Vail resort hotel and Rodgers was a customer in the restaurant. Rodgers told Pryor that his name was Eric Woolfson, and that he was the producer and keyboard player in the Alan Parsons Project, a rock band. He told Pryor a number of stories about his "wealthy, globe-trotting lifestyle" and explained to her that he and the band were in Vail to film a video.

Pryor testified that when she remarked to Rodgers that she didn't own a car, Rodgers told her he had two new cars that "he was going to be getting rid of very shortly if I would be interested in one. He would let me have it if I paid the tax on it." Rodgers explained to Pryor that he bought and sold late model cars for tax purposes, and that he was currently "getting rid of" a Mercedes–Benz and BMW for that reason. He offered to sell her either car if she would pay him only the amount of the tax on the car. Pryor agreed to buy Rodgers' Mercedes sport coupe for $2,360, the amount of tax he claimed was owed on the car.

Pryor left work that evening and accompanied Rodgers to have a drink and further conversation. Rodgers explained that he needed to call his accountant in California to determine if the cars were still available. While Pryor waited nearby, Rodgers dialed a collect call and seemed to be having a conversation with someone. After the telephone call he assured Pryor that neither car had yet been sold, and that she needed only $2,360 in cash in order to buy the Mercedes. Rodgers then explained to his accountant over the telephone that he and Pryor would fly to California the next day to get the car. Pryor never spoke with the accountant herself, nor did she hear a voice on the other end of the telephone call.

Pryor and Rodgers then walked to the apartment Pryor shared with her boyfriend, David Shastany. Rodgers convinced the couple that one of them must fly to California immediately—the next day—because he would be leaving for Hawaii in two days. The plan was for Pryor to withdraw cash from her joint bank account with Shastany the next morning, then fly to California with Rodgers and drive the car back herself.

Pryor had to fulfill another work obligation at a second job before leaving Vail, so she and Rodgers went to The Cookie Company together. While Pryor was working, Rodgers used the telephone in the store after explaining to her that he was calling the other members of the band, who were staying at a house in Vail. Pryor worked for about two hours and then used Shastany's truck to drive Rodgers to his hotel. Rodgers said he would call Pryor at 8:30 the next morning and they would depart on a 9:30 a.m. flight from Avon to Denver, then board a flight from Denver to Los Angeles.

Pryor returned to the apartment she shared with Shastany. She and Shastany discussed the events of the evening until 4:30 a.m., when they decided to call Shastany's father, who had many contacts in the music business. Shastany's father advised them to delay paying or leaving with "Eric Woolfson" until he could verify "Eric Woolfson's" story.

When Rodgers called at 8:30 a.m., Pryor told him that Shastany would be accompanying them to California. They withdrew $1,500 cash from the bank and made arrangements to have the balance of the money wired to them in California. A friend of Pryor's drove the couple to the airport, where they met Rodgers.

Rodgers bought airline tickets for the three of them, but because of inclement weather the 9:30 a.m. flight was cancelled. Because the next flight to Denver wasn't scheduled for departure until 4:30 p.m., Pryor's friend returned to the airport and retrieved all three. They left the airport and had lunch together. During lunch, Rodgers offered to sell his BMW to Shastany for $1,500, the tax on the car. Shastany agreed to this offer and when the others returned home, Shastany went to the bank to withdraw more cash for the purchase of the BMW. In the meantime, Shastany's father called at his apartment and left this message with Pryor: "[T]hat is not Eric Woolfson who is in your livingroom. He is not who he claims he is. The police have

been notified. Just stall him until someone shows up."

As he returned to the apartment, Shastany was intercepted by Vail Police Department Investigator Richard Cleveland. Cleveland accompanied Shastany back to the apartment. As the group left the apartment together, Rodgers was arrested by Cleveland and another officer who had been waiting outside.

A complaint was filed charging the defendant with theft, section 18–4–401, 8B C.R.S. (1986),[1] a class 4 felony, and criminal impersonation, section 18–5–113(1)(e), 8B C.R.S. (1986),[2] a class 5 felony. A jury trial was held in July 1984 and Rodgers was convicted of both charges. The judge imposed an eight year sentence for the theft conviction and a four year sentence for the criminal impersonation conviction, sentences to run concurrently.

The defendant appealed, and the court of appeals reversed his convictions and remanded for a new trial in *People v. Rodgers,* 734 P.2d 145 (Colo.App.1986). The court of appeals' reversal was based on its determination that the defendant's request for a mistrial, which was made after the prosecutor's closing argument, should have been granted. The prosecution filed a petition for writ of certiorari with this court, and we granted certiorari to decide whether the court of appeals correctly held that the prosecutor's remarks constituted reversible error because they violated the defendant's free exercise of his constitutional right to a jury trial and operated to deny him a fair trial.

1. Section 18–4–401, 8B C.R.S. (1986), states:
   **Theft.** (1) A person commits theft when he knowingly obtains or exercises control over anything of value of another without authorization, or by threat or deception, and:
   (a) Intends to deprive the other person permanently of the use or benefit of the thing of value; or
   ....
   (2) Theft is:
   ....
   (c) A class 4 felony if the value of the thing involved is three hundred dollars or more but less than ten thousand dollars; ...

2. Section 18–5–113, 8B C.R.S. (1986), provides:

## II.

During closing argument, the prosecutor made these statements:

"Juries are very controversial entities. As far as attorneys, some attorneys at least, there is a feeling which I will share with you that if you are innocent—rather, if you are guilty, you would want to request a jury because they just may not convict you and if you are innocent you never want to request a jury because they just might convict you."

734 P.2d at 145.

The issue on certiorari as announced by this court is:

Whether the court of appeals erred in reversing the defendant's convictions on the basis of an improper comment made by the prosecutor during closing argument without undertaking a plain error or harmless error analysis and without evaluating the prejudicial impact of the comment within the context of the entire trial and overwhelming evidence of guilt.

■ In reviewing remarks to which there was not a contemporaneous objection, a two-part analysis applies. The reviewing court must first consider whether the remarks violated a constitutional right of the defendant. If so, the court must decide whether the violation constituted plain error. *United States v. Robinson,* —— U.S. ——, ——, 108 S.Ct. 864, 867, 99 L.Ed.2d 23 (1988).[3]

### A.

■ The defendant argued, and the court of appeals agreed, that "these com-

**Criminal impersonation.** (1) A person commits criminal impersonation if he knowingly assumes a false or fictitious identity or capacity, and in such identity or capacity he:
....
(e) Does any other act with intent to unlawfully gain a benefit for himself or another or to injure or defraud another.
(2) Criminal impersonation is a class 5 felony.

3. Although the Court described this test in *Robinson,* it did not apply the plain error analysis there because the Court concluded that the error was not of a constitutional nature.

ments on his constitutional right to a trial by jury are analogous to a prosecutor's impermissible comments on an accused's exercise of his constitutional right to remain silent and denied him his right to a fair trial." 734 P.2d at 146. In arriving at this conclusion, the court of appeals applied *People v. Ortega,* 198 Colo. 179, 597 P.2d 1034 (1979). Thus, the first issue we must address is whether the prosecutor's comments on the defendant's exercise of his right to a jury constituted a violation of a constitutional right of the defendant.

"The fundamental right to trial by a jury in criminal cases is a paramount constitutional right guaranteed by the *United States Const.,* Amend. VI and the *Colo. Const.,* Art. II, Sec. 23." *People v. Evans,* 44 Colo.App. 288, 612 P.2d 1153, 1155 (1980); § 16–10–101, 8A C.R.S. (1986). It is well-established that a defendant may not be penalized by the exercise of his fifth amendment right to remain silent when he has been accused of a crime. *Hines v. People,* 179 Colo. 4, 7, 497 P.2d 1258, 1260 (1972). Because a defendant's constitutional right to remain silent cannot be used against him to draw an inference of guilt, it follows that a defendant's exercise of his constitutional right to a trial by jury cannot be used against him to create an inference of guilt. By analogy, therefore, it is impermissible for a prosecutor to make comments "which ha[ve] the effect of creating an inference of guilt by reference" to the defendant's exercise of his right to a trial by jury. *Ortega,* 198 Colo. at 182, 597 P.2d at 1036.

We note that the United States Supreme Court has drawn certain limitations on claims that the prosecution impermissibly commented upon a defendant's silence. In *Robinson,* the Court distinguished between a holding which "would forbid the prosecutor from *fairly responding to* an argument of the defendant" in contrast to a holding that the prosecution may not treat a defendant's "exercise of his right to remain silent as substantive evidence of guilt." —— U.S. at ——, 108 S.Ct. at 870 (emphasis added). In the context of the fifth amendment, we have held that a defendant cannot be penalized for exercising a constitutional privilege. *Ortega,* 198 Colo. at 183, 597 P.2d at 1036. Likewise, we agree with the court of appeals that a defendant cannot be penalized for exercising his or her constitutional right to a trial by jury rather than trial to the court. We agree with the court of appeals that there is "no significant difference between the impropriety of a prosecutor's comments on a defendant's exercise of his right to remain silent and a prosecutor's comments on a defendant's exercise of his equally fundamental right to a jury trial." 734 P.2d at 146.

### B.

Having arrived at the conclusion that the prosecutor's remark impermissibly violated a constitutional right, the court of appeals went on to hold that the prosecutor's remark required reversal of defendant's conviction. 734 P.2d at 146. However, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The court of appeals overturned the defendant's convictions in a summary conclusion, without assessing the impact of the prosecutor's remarks on the fairness of the trial.

Because there was no contemporaneous objection to the remark in question,[4] we

---

4. After making the remarks at issue here, the prosecutor made the following statements:
   [PROSECUTION:] I would suggest to you by his own words he is a professional criminal. He has made his living for ten years ripping people off. I want you, on behalf of this community, to stop this man. I want you to find him guilty of theft and criminal impersonation so that when everybody leaves the courtroom, with the possible exception of this man, we can all feel that justice has been done.
   Thank you.
   In response, defense counsel made the following objection:
   MR. LEE: I'm going to have to move for a mistrial because of the improper closing argument. The prosecutor referred to Mr. Rodg-

continue our analysis by applying the second part of the *Robinson* test. Our second inquiry is whether the prosecutor's remarks resulted in plain error, necessitating reversal of the defendant's convictions.

■ Plain error ordinarily requires reversal only if, after reviewing the entire record, the appellate court concludes that the fairness of the trial was sufficiently undermined so as to cast serious doubt on the reliability of the conviction. *Wilson v. People*, 743 P.2d 415, 420 (Colo.1987). "However, if the asserted error is of constitutional dimension, reversal is required unless the [reviewing] court is convinced that the error was *harmless beyond a reasonable doubt." People v. Graham*, 705 P.2d 505, 509 (Colo.1985) (emphasis added); *United States v. Hasting*, 461 U.S. 499, 510, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). "If there is a reasonable possibility that the defendant could have been prejudiced the error cannot be harmless beyond a reasonable doubt." *Leonardo v. People*, 728 P.2d 1252, 1257 (Colo.1986).

■ In determining whether an error was harmless beyond a reasonable doubt, prosecutorial remarks must be examined in context. *Robinson*, —— U.S. at ——, 108 S.Ct. at 869. *"Especially when addressing plain error*, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record." *Young*, 470 U.S. at 16, 105 S.Ct. at 1046 (emphasis added).

■ A number of factors enter into a plain error analysis. In *Ortega*, for example, the court of appeals noted as a factor "the wholly circumstantial evidence relied on by the prosecution [which] was subject to conflicting inferences." 40 Colo.App. 449, 453, 580 P.2d 813, 817 (1978), *aff'd*, 198

Colo. 179, 597 P.2d 1034 (1979). Likewise, a significant factor is the presence of "substantial and virtually uncontradicted evidence of [a defendant's] willful violation." *Young*, 470 U.S. at 20, 105 S.Ct. at 1048.[5] Another factor to be considered is "the posture of [the] defense." *Ortega*, 40 Colo. App. at 453, 580 P.2d at 817 (defendant's guilt rested solely on the jury's finding of whether he acted with the requisite intent). In *People v. Trujillo*, 624 P.2d 924 (Colo. App.1980), the prosecutor's misconduct was reversible error because he made improper remarks which were " 'pronounced and persistent, with a probable cumulative effect on the jury.' " *Id.* at 926 (quoting *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In the fifth amendment context, reviewing courts consider (1) whether improper remarks were used by the prosecution as a means of creating an inference of guilt, and (2) whether the prosecution argued that the defendant's exercise of his constitutional right was an implied admission of guilt. *People v. Cornelison*, 44 Colo.App. 283, 616 P.2d 173 (1980).

In the briefs filed before this court, the state asserts that the evidence presented against Rodgers was overwhelming. These assertions are supported by the record on appeal. At trial, both Pryor and Shastany testified consistently to the sequence of events already described. Investigator Cleveland testified that he met with Shastany and was eventually introduced to Rodgers as "Eric." Cleveland testified:

> At that time David Shastany took $1,000 out of his pocket and gave it to the defendant and said words to the effect, I'll give you $1,000 now and we'll take care of the rest when we get to California and I see the car. The defend-

---

ers as a professional criminal; that he's done this ten years in the past; that you can and should convict him so that he will stop this professional criminal, which is improper closing argument. It has nothing to do with the crime that's being charged and it's prejudicial.

THE COURT: Calvin, I'm going to deny it but I will reconsider it after I've had a chance to do a little research on the issue.

5. Where, as in *Young*, the prosecutor's remarks were made in response to improper closing argument remarks by the defense, then defense counsel's conduct is also a relevant factor. "[T]he Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly."

ant said, fine, whatever, let's [h]urry up....

Upon leaving the apartment building, the defendant was arrested and the $1,000 was seized from his right front pocket. After being transported to the jail, the defendant read his advisement of rights form and signed it "Michael Rodgers."

Rodgers waived his *Miranda* rights and spoke with the two officers. Cleveland testified:

I asked him had David Shastany and Kelly Pryor gone to the airport with you what would have happened, and he said, we would have flown from Avon to Denver and I said, okay, when you got to Denver what would you have done in Denver, and he said, I would have lost them, and I asked him, have you ever done this before? And he said, yes, and I said, how many other times have you done this before? He says, I have no idea.

. . . .

He said it was his entire source of income the past ten years.

The defendant did not testify, nor was any evidence presented by the defense.

■ The evidence at this trial was sufficient in both quantity and quality to support the conclusion that the jury could not have arrived at a verdict other than guilty. In this context, the prosecutor's conduct "was not so offensive as to require reversal of the defendants' convictions." *People v. Plotner,* 188 Colo. 297, 302, 534 P.2d 791, 794 (1975) (prosecutor's statement during closing argument regarding his personal opinion of the defendant's guilt was improper, but not reversible error). Where it appears that no other verdict could have been properly rendered, prosecutorial misconduct is not reversible error. *Hillen v. People,* 59 Colo. 280, 284, 149 P. 250, 252 (1915).

In light of the overwhelming evidence presented at trial against the defendant, we conclude that the prosecutor's improper remark during closing argument was harmless beyond a reasonable doubt. "Viewed in context, the prosecutor's statements, although inappropriate and amounting to er-

ror, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Young,* 470 U.S. at 16, 105 S.Ct. at 1047.

We agree with the court of appeals that the prosecutor improperly made reference to the defendant's exercise of his constitutional right to a trial by jury. However, under the facts of this case the statement did not constitute plain error. We reverse the court of appeals and remand for reinstatement of the convictions and sentences.

QUINN, C.J., dissents.

KIRSHBAUM and MULLARKEY, JJ., join in the dissent.

QUINN, Chief Justice, dissenting:

Because I cannot accept this court's holding that the prosecutor's improper comments during closing argument did not constitute reversible error, I dissent.

The right of a criminally accused to a jury trial by an impartial jury is a fundamental right, expressly guaranteed by the Sixth Amendment to the United States Constitution and Article II, sections 16 and 23 of the Colorado Constitution. *See Groppi v. Wisconsin,* 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Oaks v. People,* 150 Colo. 64, 371 P.2d 443 (1962). This court observed in *Oaks* that "[a]mong the rights guaranteed to the people of this state, none is more sacred than that of trial by jury," and that this right "does not depend upon the degree of culpability disclosed by the evidence." 150 Colo. at 68, 69, 371 P.2d at 447.

As with the case of prosecutorial comment on a defendant's refusal to testify on his own behalf during the trial, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), adverse prosecutorial comment on a defendant's exercise of the right to a jury trial is a penalty exacted for doing nothing other than that which the United States and Colorado Constitutions guarantee. I recognize that in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17

L.Ed.2d 705 (1967), the United States Supreme Court concluded that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S.Ct. at 827. The Court has also recognized, however, both in *Chapman* and more recently in *Rose v. Clark*, 478 U.S. 570, ——, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986), that there also "are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827; *see, e.g., Price v. Georgia*, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970) (violation of double jeopardy by retrial of defendant for crime for which he was impliedly acquitted in first trial not subject to harmless error analysis even though second trial resulted in conviction for same lesser included offense as in first trial and no greater punishment than that imposed in first trial); *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963) (denying indigent defendant's request for court-appointed counsel in felony prosecution not subject to harmless error rule); *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (admission of coerced confession into evidence requires reversal without regard to strength of state's evidence); *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by biased judge requires reversal regardless of state of evidence).

The constitutional right at stake here—the right to choose to be tried by an impartial jury in a criminal case—is a right so integral to the integrity and continued viability of our constitutional system of adjudication that any direct assault on that right requires reversal and a new trial untainted by the initial unfairness. The prosecutor's uninvited and unprovoked comments in this case were purposely calculated to persuade the jury to return a guilty verdict solely because the defendant exercised his right to a jury trial. Such prosecutorial imputation of guilt clashes head-on with the presumption of innocence and undermines the very foundations on which our system of criminal justice is built. The difference between the complete denial of the right to a trial by jury and, as here, imputing guilt to the defendant for exercising that right is at best a difference in degree only, not a difference in kind.

Remarks such as these have no place in our system of justice and represent the very antithesis of the constitutionally prescribed manner in which the state and its officers are required to treat an accused. The employment of a harmless error analysis under these circumstances results in trivializing the error and in depreciating the value of the right so egregiously violated. In my view, reversal is required here without regard to the strength of the state's case against the defendant.

I would affirm the judgment of the court of appeals and remand the case for a new trial.

I am authorized to say that Justice KIRSHBAUM and Justice MULLARKEY join me in this dissent.